Filed 2/22/23  In re J.H. CA4/2
See concurring/dissenting opinion

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re J.H., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E078629 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2000631) |
| v. | OPINION |
| J.H., | |
| Defendant and Appellant. | |
| In re J.H., a Person Coming Under the Juvenile Court Law. | E078813 |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | (Super.Ct.No. RIJ2000631) |
| Plaintiff and Respondent, | |
| v. | |
| R.H., | |
| Defendant and Appellant. | |

1

APPEAL from the Superior Court of Riverside County. Cheryl C. Murphy, Judge. Affirmed in part; reversed in part with directions.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, J.H.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant, R.H.

Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel for Plaintiff and Respondent.

This appeal concerns the paternal grandmother's attempt to have her medically fragile grandson, J.H., placed with her. Father and grandmother separately argue the juvenile court judge, Riverside County Superior Court Judge Cheryl C. Murphy, erred by not giving her preference for placement as a relative under Welfare and Institutions Code section 361.3 (unlabeled statutory citations refer to this code) and denying father's section 388 petition to change the order placing J.H. with his foster caregivers, and prospective adoptive parents, in favor of placement with grandmother. We conclude the trial judge erred by holding the relative placement preference didn't apply, but conclude the error was harmless.

Father also argues we should reverse the order that ICWA doesn't apply to J.H.'s case because the Riverside County Department of Public Social Services failed to fulfill its duty of initial inquiry under state law implementing the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224.2, subd. (b).) We agree and

therefore vacate the findings and remand for a new ICWA finding after the juvenile court is satisfied the department has discharged their duty of inquiry.

# I

# FACTS

This dependency arose after the Riverside County Department of Public Social Services (department) received a referral about possible neglect of newborn J.H., who was hospitalized in the Neonatal Intensive Care Unit (NICU).

On October 13, 2020, a social worker observed the baby in the hospital. He remained in NICU because he was premature. The social worker attempted to contact the parents at the hospital, but staff told her they hadn't returned since mother's discharge on October 7 and didn't stay in communication with them. The child was receiving formula through a nasogastric tube (NG tube). Hospital staff said the parents still needed to be taught how to use the NG tube.

The social worker later reached mother by phone. Mother acknowledged she drank alcohol throughout her pregnancy. She also said she hadn't received prenatal care and didn't plan to participate in services. She said she would not submit to a drug test because she had already admitted to drinking alcohol. Though she had a black eye on October 6, 2020, she denied any domestic violence and denied needing domestic violence classes. She also reported she didn't have Native American ancestry.

The social worker contacted father by phone as well. Father admitted he had a history of drug use and had been incarcerated for drug possession but denied needing

3

substance abuse services. He said he was aware mother drank during her pregnancy. He acknowledged being intoxicated at the hospital on October 7 and being asked to leave. Like mother, he said he didn't have Native American ancestry.

The next day, the paternal grandmother told the social worker the parents lived in her home. She said she knew mother drank during her pregnancy and said the parents fight a lot. She said she was concerned about father's substance abuse. She told the social worker she couldn't take the child and couldn't provide a support system for the parents and the child because she works during the day. She said she already served as guardian of the father's older child. She said she didn't know of any relatives who could take custody of the child.

The department detained the child from the parents. On October 16, 2020, they placed him with his future prospective adoptive parents and filed a section 300 petition alleging the parents had neglected him due to domestic violence and substance abuse.

At the detention hearing three days later, both parents filed ICWA-020 Parental Notification of Indian Status forms, indicating they don't have any Native American ancestry, and father repeated that denial on October 28. The trial court made temporary detention findings against the parents and ordered twice-weekly supervised visits. The judge continued the detention hearing so father could be transported from jail, and the next day found father to be J.H.'s presumed father and adopted the temporary detention findings as permanent.

At the hearing, father named the paternal grandmother and a nonrelated extended family member, D.G., as potential placement options. The judge ordered the department to assess D.G. for placement. On October 29, 2020, the department sent a Resource Family Approval (RFA) application to D.G. for placement evaluation. On November 16, 2020, D.G. was denied emergency placement of the child while the exemption process was pending.

At the contested jurisdiction hearing on December 9, 2020, the trial judge found all but two of the allegations against the parents true. The judge found the department had conducted a sufficient inquiry about the child's Native American ancestry and determined ICWA doesn't apply. The judge made J.H. a dependent of the court, removed the child from the parents' physical custody, and ordered family reunification services.

In January 2021, the paternal grandmother asked to be evaluated for placement, and an RFA referral was submitted on her behalf the next day. The department mailed an application to her, and she was given 30 days to return it. However, on March 8, 2021, the paternal grandmother told the social worker she would not submit the application. The social worker explained that would mean closing the referral, and the grandmother said she would like D.G.'s application to be approved before continuing with her own. A week later, the grandmother sent a text message saying she had changed her mind and would fill out an RFA application. However, by then the RFA unit had already reported they hadn't received her application.

At the six-month status review hearing, the department recommended the judge terminate the parents' reunification services and set a section 366.26 hearing. Mother's whereabouts were unknown and father was incarcerated and awaiting sentencing for a number of convictions, including one for domestic violence. At the time, a criminal protective order restrained father from having contact with mother until October 2023. Father had attended anger management and substance abuse services while in custody, but his work was found to be unacceptable.

The judge ordered in-person visits between J.H. and his paternal grandmother and ordered the department to contact her about a placement assessment. The department contacted the grandmother the same day to establish whether any other adults lived in her home. She provided the social worker with her husband's information and they submitted an updated referral to the RFA unit. The grandmother had until July 14, 2021 to submit her application.

Meanwhile, on July 29, 2021, the caregiver filed a request for de facto parent status. The caregiver said J.H. had lived with her from October 16, 2020 to July 23, 2021. She said she cared for the child's everyday needs, took him to doctor appointments and therapy sessions, advocated for him about his developmental delays, and generally provided love for the child. She said she had tried to schedule video visits with the paternal grandmother for several months without success. She reported J.H. met the paternal grandmother for the first time in person on June 17, 2021 and visited him again on July 15 and 22, 2021. He cried consistently through these visits.

6

The caregiver said she was very concerned about J.H.'s condition and development. She reported he exhibited "constant head jerking and un-usual eye blinking." She took him to a neurologist, and the doctor ruled out seizures. An occupational therapist then discovered J.H. suffered from ankyloglossia (tongue-tie), which can limit the ability to eat, and it was determined he would need surgery to correct the condition. J.H. had a second medical consultation regarding his tongue tie on July 14, 2021. The caregiver notified the grandmother about J.H.'s medical appointment, but she didn't come and didn't ask about the child's health or development during visits.

The grandmother completed all aspects of the RFA process. However, on August 17, 2021, the RFA unit reported the paternal grandmother's husband has a criminal history that requires an exemption for placement to proceed. They also reported the assessment of D.G. had been closed because they received no response from her. D.G. said she didn't know if she wanted to continue because the paternal grandmother was being assessed.

On August 23, 2021, the father filed a section 388 petition asking the court to make a direct placement of the minor with the paternal grandmother. Father said circumstances had changed because the paternal grandmother now wanted placement. He said placement with the grandmother is in the child's best interest because she is the legal guardian of his half sibling. In a letter to the court, the grandmother said she spent months trying to fill out applications and talk to the right people to bring J.H. home. She said in the beginning, the video visits were foreign to her and she had difficulty adjusting to

7

them. She denied missing visits, though she said there were times when her audio was muted or there were problems with the software.

The judge held a contested six-month status review hearing on August 24, 2021. She again found ICWA doesn't apply. She also found the department had made a sufficient inquiry and there was no new information to indicate ICWA may apply. The judge continued family reunification services for the parents. She ordered the department to supervise the paternal grandmother's visits. The judge also granted the caregiver's request to be declared J.H.'s de facto parent. She also set the section 388 petition for hearing, which was subsequently continued several times.

On September 9, 2021, the social worker met with the child and caregiver. The child smiled and crawled over to the social worker who sat him on her lap. The caregiver expressed concerns about the child's ongoing health and development issues and said the paternal grandmother doesn't ask about his health or developmental needs. The caregiver continued to seek appropriate medical care for J.H. The child was prescribed albuterol and a breathing treatment for a persistent cough, and his breathing improved. The child was also seen by a gastroenterologist due to gut inflammation and given a different formula. The doctor said he may have a problem absorbing nutrients. The caregiver also took J.H. to therapy twice a week. The same month, the grandmother had supervised visits that went well. J.H. approached the grandmother freely and didn't cry at the end of their visits.

On October 28, 2021, the grandmother's home was approved for placement. However, the child wasn't placed with grandmother because the department had referred the child to the unit for medically fragile children due to concerns over his development and health, which made it possible he would be having many medical and other services during grandmother's work hours. The department reported he would be assessed and a Child and Family Team Meeting would be held to discuss possible placement with grandmother. The department had invited the grandmother to the child's medical appointment with his feeding therapist, but she declined. The grandmother had weekly supervised visits with J.H. without incident, though some were cancelled due to illness.

The caregiver continued to meet the child's needs and remained willing to adopt the child. The caregiver reported she is trained to care for medically fragile children. On December 2, the caregiver received training with a public health nurse. She said she was willing to provide care for the child, knew how to recognize potential symptoms of a seizure disorder, knew what to do if a seizure occurred.

At the contested twelve-month status review hearing on December 8, 2021, the father said he believed it was better for J.H. to be with his grandmother and half sibling, because they were his family. The trial judge again found ICWA doesn't apply, the department had made a sufficient ICWA inquiry, and no new information indicated ICWA may apply. The judge terminated the parents' reunification services and set a section 366.26 hearing. The judge also continued the section 388 petition requesting placement with the grandmother.

On December 9, 2021, it was determined J.H. has a "significant eating disorder that has altered his growth." He also has "a restrictive airway disorder that may also be affected by the choking and gagging demonstrated during the meals. He will need follow up with a swallow evaluation and therapeutic measures." Because of these conditions he was determined to be a medically fragile child.

On December 9, 2021, the public health nurse met with the grandmother by telephone for the one-on-one session. The public health nurse said the grandmother was not aware of the rhythmic type movements the child has been presenting. She was aware the child has some gastrointestinal problems, is tongue tied, is scheduled to have surgery, is developmentally delayed, and has feeding challenges. The public health nurse told the grandmother he may need to have therapy as well as see a nutritionist.

At a Child and Family Team Meeting on January 13, 2022, it was decided the child should remain with his current caregiver. The paternal grandmother was present and said she had never missed a medical appointment for J.H.'s half sibling. She said she would quit her job if J.H. were placed with her and would live off her savings and retirement. She said she would not put J.H. in harm's way by exposing him to the parents and said father will not live in her home after his release from custody. The father had reported he planned to live with a cousin after his release. He said he wanted J.H. to live with his grandmother and said she has support from other family members. The child's early intervention specialist indicated the child has developed a strong trusting relationship with his caregiver.

On January 20, 2022, the caregiver called the social worker after the child's medical appointment. She reported the paternal grandmother was able to listen in on his appointment by telephone. The doctor said the child is two months delayed, prescribed him formula because he needs to add weight and does not appear to be eating enough. The doctor also noticed the child's left leg is turned in, which may affect his walking and require physical therapy.

At a hearing on father's section 388 petition on February 8, 2022, the grandmother testified she wants to care for J.H. She said she had always wanted him but she wanted to give the parents a chance to reunify. She said she believed it was best for him to be with his half sibling and family. She said she wanted more information about J.H. and was willing to take him to his appointments and therapy.

The trial judge found the grandmother did request placement early, but she withdrew the request when D.G. also requested placement. The judge noted grandmother hadn't renewed her request until August 2021, when J.H. had long been in his placement with the current caregiver. She concluded the statute requiring preference for relative placements isn't triggered after a placement has occurred unless there is a need for a change of placement. Since there was no need for a change in this case, the preference didn't apply.

The judge then discussed J.H.'s circumstances. "[T]he minor is in the home of the de facto parent, essentially [for] the entire life of the minor. And the de facto parent is meeting all the needs of the minor. There are a number of medical challenges for the

11

minor, and the caregiver is meeting those areas by ensuring the minor does attend all of the various medical appointments as needed and responds to the direction of the medical providers." The judge said, "it's clear that the minor is bonded with the caregivers, calls them 'mama' and 'dada.' The caregivers are willing to adopt. The minor is considered special needs, [and] was found to be medically fragile."

By contrast, the judge found grandmother and the child didn't have much of an attachment. Though she did have adequate knowledge of his medical history and needs, "there has been some issues and difficulties even with setting up visitation for paternal grandmother," which gave rise to doubts about how much flexibility she would have to take care of his special needs.

The judge found it was not in the minor's best interest to change placement and denied the section 388 petition. She then set a section 366.26 hearing for April 6, 2021.

Father filed a timely notice of appeal. Grandmother appealed separately. We consolidated the appeals at the request of father.

## II

## ANALYSIS

A. *Request to Place the Child with Paternal Grandmother*

Father and paternal grandmother argue separately that the trial court erred by refusing to place J.H. with the paternal grandmother. They argue grandmother should have received preferential consideration as a family member and that the trial judge

12

abused her discretion by denying placement in favor of the caregiver.[1]

"In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." (§ 361.3, subd. (a).) "'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c).) "If the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied." (§ 361.3, subd. (e).)

The preferential consideration rule applies "[a]t the outset of the case and during the reunification period." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 591.) "'Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period. [Citations.] During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court.'" (*Id.* at p. 592.) Thus, though paternal grandmother withdrew her early request for placement, the preferential consideration rule applies because she renewed her request and completed her approval on October 28,

---

[1] The department argues grandmother doesn't have standing to challenge the trial judge's ruling on father's section 388 petition. We disagree. Grandmother's "separate interest in her relationship with . . . her grandson . . . is legally protected in section 361.3, which confers upon a grandparent the right to preferential consideration for placement. '[A]ny person having an interest recognized by law in the subject matter of the judgment, which interest is injuriously affected by the judgment' is considered a 'party aggrieved' for purposes of appellate standing." (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034-1035; *accord*, *In re K.T.* (2019) 42 Cal.App.5th 15, 19-20.)

2021, before the judge terminated the parents' reunification services on December 8, 2021. (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 721 ["when a relative voluntarily comes forward at a time when a new placement is not required, the relative is entitled to the preference and the court and the social worker are obligated to evaluate that relative"].)

The trial judge therefore erred in refusing to apply the relative placement preference in evaluating whether to move J.H. into his grandmother's care. We nevertheless conclude the error was harmless. As we've noted, the judge denied father's section 388 petition seeking a change of placement after finding it was not in the minor's best interest to move from his caregiver's care to his grandmother's care. That is the crucial issue when evaluating placement under the relative placement statute, and the ruling makes clear she considered the same factors relevant under section 361.3. Grandmother concedes the court considered the statutory factors but argues she did so in a perfunctory fashion.

"When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement." (*In re Isabella G.*, *supra*, 246 Cal.App.4th at p. 719.) Factors to consider in evaluating a placement include, but aren't limited to, (1) the best interests of the children, (2) the wishes of the parents, (3) proximity of the placement for visitation and reunification with the parents, (4) placement of any siblings and half siblings in the same home, (5) the good moral

14

character of the relative, (6) the nature and duration of the relationship between the child and relative, (7) the relative's ability to provide appropriate and safe care of the child and facilitate visitation with the child's other relatives, and (8) the safety of the home. (§ 361.3, subd. (a)(1)-(8).) "The linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863 (*Alicia B.*).)

The focus of the argument for placing the child with his grandmother has always been the fact that she was family and she had custody of his half sibling—two important, but not dispositive factors. Grandmother testified to that effect in the placement hearing. Father's advocacy established his preference for the placement, and there was no reason to doubt grandmother's character. However, other factors, which might have supported the placement if pursued early in the case, no longer did. By the time of the section 388 petition, reunification services were terminated, so proximity with the parents and facilitating visits was no longer important. Indeed, even before the judge terminated services, parental visits weren't relevant because father had been incarcerated and mother's location was unknown. Perhaps most important, as the judge emphasized, by the time of grandmother's late request for placement, the child had not spent enough time with the grandmother to have much of a bond with her.

Other factors provided a very strong basis for concluding J.H. should remain with his current caregivers. The child was removed near birth and had lived nearly his entire life with the caretaker's family. As the judge noted, J.H. identified the caregivers as

15

"mama" and "dada." Crucially, the female caretaker had taken on the challenge of getting diagnoses and treatment for J.H.'s numerous serious medical challenges. More, she had been trained in taking care of J.H.'s special needs when he had been determined to be a medically fragile child. Indeed, the caregiver was a forceful advocate for the child's well-being and was responsible for obtaining medical diagnoses and appropriate care for him. Despite these challenges, his caregivers were committed to adopting him.

We conclude this record establishes the trial judge's analysis very closely tracked what she would have done had she explicitly evaluated the request for placement directly under section 361.3, and it's not reasonably probable conducting her analysis explicitly under the rubric of section 361.3 would produce a more favorable ruling for father and grandmother. While the relative placement preference does give advantage to relatives who request placement, it does not guarantee or create a presumption in favor of such placements. (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 863) The focus on the inquiry remains on the best interest of the child, and in this case the record strongly supports finding J.H. would be served by leaving him in the care of his life-long and dedicated caregiver, who's trained in caring for his medical needs, rather than uprooting him and placing him with his paternal grandmother. (*Id.* at p. 862.)

At oral argument, father argued we should remand for a hearing under section 361.3 because the relationship with the caregiver family is not a factor listed under that provision. He argues the error in not holding a hearing under that section was not harmless because the judge could not properly have considered the caregiver relationship

16

at such a hearing. We disagree. As mentioned, the factors listed in section 361.3 are not exhaustive. (§ 361.3, subd. (a) ["In determining whether placement with a relative is appropriate, the county social worker and court shall consider, *but shall not be limited to*, consideration of all the following factors," italics added].) While we agree at the outset of a dependency the child's relationship with a caregiver would be of no import before placement and potentially of little import very early in the dependency process, it is of great significance in circumstances, as here, where a relative seeks to initiate a change in placement very late in a dependency, long after the child and caregiver have developed a substantial relationship. In that setting, we believe the court could have and should have considered the child-caregiver relationship.

We therefore affirm the order denying father's section 388 petition for change of placement order.

B. *ICWA Investigation*

Father argues we must reverse the finding that ICWA doesn't apply because the department failed to discharge their duty of initial inquiry under ICWA-related state law by failing to ask the child's extended family members about potential Native American ancestry as required by section 224.2, subdivision (b). We agree.

ICWA establishes minimum federal standards a state court must follow before removing Indian children from their families. (*In re T.G.* (2020) 58 Cal.App.5th 275, 287 (*T.G.*).) California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes. (See Welf. & Inst. Code, §§ 224-

224.6.) An Indian child is any unmarried person under 18 who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (b).)

At the heart of ICWA is the requirement to provide notice of the dependency proceedings to the relevant Indian tribe or tribes when there is "reason to know" the child is an Indian child. (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3, subd. (a).) The purpose is to enable the tribes "to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter." (*T.G.*, *supra*, 58 Cal.App.5th at p. 288.) Because ICWA defines "Indian child" in terms of tribal membership, not race or ancestry, "the question of membership is determined by the tribes." (*T.G.*, at pp. 275, 294; see also *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65-66, fn. 21 [the Indian tribe is final arbiter of its membership rights].) Notice to the tribes is therefore "central to effectuating ICWA's purpose" because it enables the tribe to make the determination and decide whether to intervene. (*T.G.*, at pp. 275, 288.)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741 (*Benjamin M.*).) These inquiries, collectively referred to as the duty of inquiry, are a precursor to the notice requirement—they are designed to

18

enable the department and the juvenile court to determine whether notice to the tribes is necessary. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 884-883.)

The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry. (*T.G.*, *supra*, 58 Cal.App.5th at p. 290.) Our case involves the duty of initial inquiry only. Federal regulations require state courts to ask each participant "at the commencement" of a child custody proceeding "whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a).) California law requires the court to make the same inquiry of each participant at their "first [court] appearance." (Welf. & Inst. Code, § 224.2, subd. (c).) California law also requires the department, when taking a child into temporary custody, to ask "the child, parents, legal guardian, Indian custodian, *extended family members*, others who have an interest in the child," and the reporting party whether the child is or may be an Indian child. (Welf. & Inst. Code, § 224.2, subd. (b), italics added.) Extended family members include adults who are the child's stepparents, grandparents, siblings, siblings-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

To ensure tribes receive notice when required, the duty of initial inquiry applies to both the department and juvenile court judges on an "affirmative and continuing" basis. (§ 224.2, subd. (a).) It "begins with initial contact" and applies through termination of parental rights "and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*T.G.*, *supra*, 58 Cal.App.5th at p. 290.)

When the department fails to comply with the duty of initial inquiry under state law, the error is prejudicial, and we will therefore reverse, if "the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Notably, this doesn't require "proof of an actual outcome (that the parent may actually have Indian heritage)," rather, the missing information need only be relevant to the ICWA inquiry, "whatever the outcome will be." (*Benjamin M.*, at pp. 743-744.) In this case, the department failed to fulfill their duty of initial inquiry because they asked only the parents about Native American ancestry.[2]

As a result of the department's failure, the judge's findings that ICWA did not apply and that the department conducted an adequate inquiry are not supported by the record. (*In re J.C.* (2022) 77 Cal.App.5th 70, 79-80.) "[T]he court had a duty either to require [the department] to provide a report with complete and accurate information regarding the results of [their] inquiry . . . or to have the individual responsible for notice to testify in court regarding the inquiry made . . . . Only then could the court determine whether [ICWA] applied." (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

---

[2] The dissent follows the reasoning of the concurring opinion in *In re Adrian L.* (2022) 86 Cal.App.5th 342, 355-359 (conc. opn. of Kelley, J.) to conclude the expanded duty of initial inquiry applies only if the child was taken into temporary custody without a warrant under section 306. We don't reach that issue because the parties didn't raise it and, when questioned at oral argument, asked us not to rule on that basis. We conclude they've provided no reason to depart from our contrary precedent. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 742-745; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 680.)

20

This was error and it was prejudicial. Father's extended family members were readily available—his mother in particular was in contact with the department almost continuously—and their responses would "shed meaningful light on whether there is reason to believe" he is an Indian child. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) On remand the department should also attempt to contact other extended family members.

The department raises a number of arguments why remand is unnecessary, all of which we reject. First, the department argues we should decline to follow *Benjamin M.*—our division's most recent precedent on the prejudice standard—and instead use the standard we applied in *In re A.C.* (2021) 65 Cal.App.5th 1060, which requires a parent to make an affirmative representation of Indian heritage on appeal. (*Id.* at p. 1069.) But, as we explained in *Benjamin M.*, we think that standard inappropriately shifts the burden of inquiry to the parents, to the detriment of potentially interested tribes. (See *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 745.) Though in *Benjamin M.* only one parent denied Indian ancestry and both parents did in this case, section 224.2, subdivision (b) makes clear, the parents are not the end of the inquiry. "By requiring the Department to inquire of a child's extended family members as to the child's possible Indian ancestry, the Legislature determined that inquiry of the parents alone is not sufficient." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 431.) "[T]he point of the statutory requirement that the social worker ask all relevant individuals whether a child is or may be an Indian child" is "to obtain information the parent may not have." (*In re Y.W.* (2021) 70 Cal.App.5th 542,

21

556.) We are unmoved by the department's request to return to a prejudice standard we have expressly disapproved.

The department argues we should find their admitted failure to inquire harmless because the paternal grandmother sought placement with the child and ICWA gives a preference for placement with a Native American child's extended family. They argue that means the grandmother would have had a "strong incentive to bring to the court's attention any facts that suggest" the child has Native American ancestry, and her failure to do so implies she was unaware of such facts. We disagree the inference is warranted because it presupposes the paternal grandmother knew about the ICWA inquiry and knew establishing Native Ancestry through her family would have given her an advantage in obtaining placement. The department points to no evidence to underwrite this assumption, and the department failed to conduct ICWA inquiry which might have alerted her.

Finally, the department argues father's ICWA challenge has been mooted by their postappeal investigation and have filed a motion to dismiss the appeal on the basis of a declaration from the social worker describing the inquiries he made *after* father filed his opening brief. They argue we may consider this evidence under Code of Civil Procedure section 909, which "permits an appellate court to take additional evidence and make independent factual findings on appeal," in appropriate cases, "to determine whether an issue on appeal is moot." (*In re M.B.* (2022) 80 Cal.App.5th 617, 627, citing *In re Josiah Z.* (2005) 36 Cal.4th 664, 676.)

There is a split of authority on how to handle postjudgment evidence of an agency's ICWA investigation. The department cites *In re Allison B.* (2022) 79 Cal.App.5th 214, in which the appellate court considered postjudgment evidence of the agency's postappeal investigation under Code of Civil Procedure section 909 when reviewing the juvenile court's ICWA finding. The sounder approach is the majority view, recently adopted by this court, which requires the *juvenile court* to consider the evidence and *allow the parent an opportunity to challenge it*. (*In re Ricky R.*, *supra*, 82 Cal.App.5th at p. 671; see also *In re E.V.* (2022) 80 Cal.App.5th 691; *In re Jennifer A.* (2002) 103 Cal.App.4th 692; *In re M.B.*, *supra*, 80 Cal.App.5th 617; *In re K.M.* (2015) 242 Cal.App.4th 450, 458 (*K.M.*).) Where, as here, both the agency and the juvenile court judge failed to follow state law implementing ICWA, "[m]aking the appellate court the trier of fact is not the solution." (*In re Jennifer A.*, at p. 703.) Instead, the juvenile court should consider in the first instance whether the department remedied their failure and fulfilled the duty of initial inquiry. (*In re E.V.*, at pp. 700-701.) We therefore deny respondent's motion to consider postjudgment evidence.

We note that where, as here, the ICWA error is clear, "[t]he most expeditious and efficient way to solve th[e] problem is for the parties to stipulate to a limited reversal and an expedited remittitur." (*K.M.*, *supra*, 242 Cal.App.4th at p. 458.) Of course, the most expeditious course would be for the department to follow the very clear rules regarding ICWA inquiries from the outset.

# III

## DISPOSITION

We affirm the order denying father's section 388 petition to change the placement order. We deny the department's motion to dismiss father's appeal and vacate the order finding ICWA does not apply. On remand, the juvenile court shall order the department to comply with the duty of initial inquiry (Welf. & Inst. Code, § 224.2, subd. (b)) and, if applicable, the duty of further inquiry (Welf. & Inst. Code, § 224.2, subd. (e)) and the duty to provide notice to the pertinent tribes (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3). If the court determines ICWA does not apply, the order shall be reinstated. If the court determines ICWA does apply, the court shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH

Acting P. J.

I concur:

FIELDS

J.

[*In re J.H.; DPSS v. J.H.*, E078629]
[*In re J.H.; DPSS v. R.H.*, E078813]

MENETREZ, J., Concurring and Dissenting.

In my view, the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 applies only if the child was taken into temporary custody without a warrant pursuant to Welfare and Institutions Code section 306. (See *In re Adrian L.* (2022) 86 Cal.App.5th 342, 355-359 (conc. opn. of Kelley, J.).) No opinion of this court has ever addressed that issue, so we have no contrary precedent. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160 ["'it is axiomatic that cases are not authority for propositions not considered'"]; *Fairbanks v. Superior Court* (2009) 46 Cal.4th 56, 64 ["a judicial decision is not authority for a point that was not actually raised and resolved"].) The child in this case was detained pursuant to a warrant, so the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 does not apply. I therefore respectfully dissent from the majority opinion's reasoning and result concerning the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and related California law, but I otherwise concur. I would affirm the juvenile court's findings and orders in their entirety.

MENETREZ          
J.

1